## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## SOUTHERN DIVISION

No. 7:14-CV-00161-FL

| | |
|---|---|
| GWENDOLYN JACKSON PINNIX | ) |
| and WARREN IVAN JACKSON, | ) |
| *executors of the Estate of David W.* | ) |
| *Jackson, Sr.,* | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) ORDER |
| | ) |
| SSC SILVER STREAM OPERATING | ) |
| COMPANY, LLC, et al., | ) |
| | ) |
| Defendants. | ) |

This matter is before the court on Plaintiffs' Motion to Compel [DE-25] and Defendant SSC

Silver Stream Operating Company, LLC's ("Defendant") Motion to File Document Under Seal [DE-

35]. Defendant has responded to Plaintiffs' Motion to Compel [DE-32], and the time for Plaintiffs

to respond to Defendant's Motion to Seal has elapsed. Accordingly, the motions are ripe for ruling.

For the reasons that follow, Plaintiffs' Motion to Compel and Defendant's Motion to Seal will both

be granted.

## BACKGROUND

On or about June 27, 2014, Plaintiffs filed a complaint in the Superior Court of New Hanover

County against Defendants SSC Silver Stream Operating Company, LLC and SavaSeniorCare, LLC.

Compl. [DE-1-1]. Plaintiffs assert state law administrative and corporate medical malpractice claims

and ordinary negligence claims against both Defendants in conjunction with the death of David

Jackson ("Jackson") while a resident at a nursing home owned and operated by Defendants. *Id.* ¶¶

27-54. Jackson died on July 26, 2013, due to injuries sustained in an accident on July 21, 2013,

involving a wheelchair ramp in front of the nursing home. *Id.* ¶¶ 25-26. Plaintiffs seek survival and wrongful death damages in addition to punitive damages. *Id.* ¶¶ 55-60. Defendants timely removed the action to this court pursuant to 28 U.S.C. § 1441, invoking the court's diversity jurisdiction under 28 U.S.C. § 1332. Notice of Removal [DE-1].

Defendant SavaSeniorCare, LLC filed a motion to dismiss for lack of jurisdiction [DE-13], and subsequently Plaintiffs filed a notice of voluntary dismissal, dismissing all claims against SavaSeniorCare, LLC without prejudice, leaving Defendant SSC Silver Stream Operating Company, LLC as the remaining Defendant in this case. [DE-18]. The court then entered a Case Management Order with the following critical deadlines: discovery and mediation to be completed by October 10, 2015, and dispositive motions to be filed by December 1, 2015. [DE-20]. Upon the parties' Joint Motion to Amend the Case Management Order, the court amended the Case Management Order as to the following deadlines: Plaintiffs' expert witnesses must be identified by October 1, 2015; Defendant's expert witnesses must be identified by February 1, 2016; all discovery to be completed by May 15, 2016; and all dispositive motions to be filed by June 15, 2016. [DE-28].

## DISCUSSION

### 1. Plaintiffs' Motion to Compel [DE-25]

On May 28, 2015, Plaintiffs filed a motion to compel pursuant to Rule 37 of the Federal Rules of Civil Procedure, seeking a court order directing Defendant to respond to Requests for Production Nos. 2, 3, 4, 5, 6, and 8 of Plaintiff's Third Request for Production of Documents. Pls.' Mot. [DE-25]. Those requests seek the following information:

2. All "Safety Audit – Entrance and Grounds" forms (OP2 0401.01 E2) completed in 2012 and 2013.

2

3. All Safety Team Committee meeting minutes that were generated in the two (2) years prior to July 21, 2013 that reference in any way the ramps from the sidewalk of the front of the Nursing Home to the parking lot of the Nursing Home.

4. All Safety Team Committee meeting minutes or documents that were generated in the two (2) years prior to July 21, 2013 that relates [sic] in any way to resident elopement and/or resident supervision while on the exterior premises of the Nursing Home.

5. The Safety Team Committee Toolkit that was in use in 2013.

6. All documents that relate to any accidents or injuries sustained by any resident of the Nursing Home on the exterior premises of the Nursing Home in the two years prior to July 21, 2013 (you may redact the names of residents).

8. The Weekly, Monthly, Periodic and any other checklist that shows preventative maintenance (specifically painting) on the exterior parking lot, sidewalk, or walkways of the Nursing Home in the three (3) years prior to July 21, 2013.

Pls.' Third Req. for Prod. [DE-25-1] at 1-3.

Defendant objected to the Requests for Production in question, asserting the quality assurance privilege in response to each request. *See id.* at 2 (in response to Request #2, Defendant states "[t]his request is objected to on the grounds that these documents are generated as part of the Facility's Quality Assessment and Assurance process and constitute confidential Quality Assessment and Assurance Committee Records. Ref. C.F.R. 438.75(o)."). In response to Request # 6, Defendant also objected on the basis that disclosure of the information sought would be prohibited by the Health Insurance Portability and Accountability Act ("HIPAA"). *Id.* at 3. Defendant also stated, in response to Request # 8, "[t]o the extent that this request is seeking copies of maintenance plans and specifications, no such documents exist." *Id.*

In support of their motion to compel, Plaintiffs argue that Defendant has failed to prove the

3

requested documents are protected by North Carolina's quality assurance privilege. Pls.' Mem. [DE-26] at 6-10. Specifically, Plaintiffs argue that the Safety Committee is not a quality assurance committee as defined by North Carolina law, and even assuming that the Safety Committee is a quality assurance committee, the information sought was otherwise available such that it is not shielded by the quality assurance privilege. *Id.* In response, Defendant asserts that the Safety Committee meeting minutes, toolkit, and completed audit forms are protected by the quality assurance privilege under both North Carolina and federal law because those documents were part of the quality assurance committee meetings, considered by the quality assurance committee, and specifically produced for the purpose of quality assessment, and the request seeking documents relating to other accidents or injuries sustained by any resident on the exterior premises is overly broad and unduly burdensome, in addition to seeking information protected by HIPAA. Def.'s Mem. [DE-33] at 5-17.

Fed R. Civ. P. 26(b)(1) provides the general rule regarding the scope of discovery. "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). "Relevancy under this rule has been broadly construed to encompass any possibility that the information sought may be relevant to the claim or defense of any party." *Equal Emp't Opportunity Comm'n v. Sheffield Fin. LLC*, No. 1:06CV00889, 2007 WL 1726560, at *3 (M.D.N.C. June 13, 2007) (unpublished) (internal citations and quotations omitted). When a party fails to respond to a request for production of documents pursuant to Rule 34 of the Federal Rules of Civil Procedure, Rule 37 provides that "[a] party seeking discovery may move for an order compelling . . . production[.]" Fed. R. Civ. P. 34; 37(a)(3)(B). However, the Federal Rules also provide that the court may "limit the frequency or extent of discovery otherwise allowed by

4

these rules" if it determines that "(i) the discovery sought is unreasonably cumulative or duplicative ... (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit . . . ." Fed. R. Civ. P. 26(b)(2)(C). Additionally, "the court has 'substantial discretion' to grant or deny motions to compel discovery." *English v. Johns*, No. 5:11-CT-3206-D, 2014 WL 555661, at \*4 (E.D.N.C. Feb. 11, 2014) (unpublished) (quoting *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 929 (4th Cir. 1995)).

"Rule 501 mandates that state law determines evidentiary privileges that apply to state claims litigated in federal court." *Hartsell v. Duplex Prods., Inc.*, 895 F. Supp. 100, 101 (W.D.N.C. 1995) (citing *Doe v. Am. Nat'l Red Cross*, 788 F. Supp. 884, 888 (D.S.C. 1992)); Fed. R. Evid. 501 ("But in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."). Here, Plaintiffs have only asserted state law claims against Defendant, and this court's jurisdiction is grounded in diversity. *See* Compl. [DE-1-1]; Notice of Removal [DE-1]. Defendant argues that the federal quality assurance privilege, pursuant to 42 U.S.C. § 1396r(b)(1)(B), 42 U.S.C. § 1395i-3(b)(1)(B), and 42 C.F.R. 483.785, shields the Safety Committee meeting minutes, toolkit, and completed audit forms from discovery, but makes no argument as to why the federal privilege applies given that this is a diversity case where Plaintiffs have asserted only state law claims. Def.'s Mem. [DE-33] at 11-14. Accordingly, given that state law determines the resolution of Plaintiffs' claims, this federal privilege is inapplicable here. *See Ashcraft v. Conoco, Inc.*, 218 F.3d 282, 285 n.5 (4th Cir. 2000) ("[I]n a diversity action the availability of an evidentiary privilege is governed by the law of the forum state"); *Hartsell*, 895 F. Supp. at 102 ("Since plaintiff's claims . . . find their rule of decision in state law, Rule 501 states unequivocally that the [North

5

Carolina] statutory privilege applies.").

North Carolina General Statute § 131E-107 "restrict[s] discovery of certain materials in civil

actions against providers of health care services and nursing homes respectively." *Hayes v. Premier*

*Living, Inc.*, 181 N.C. App. 747, 751, 641 S.E.2d 316, 318 (2007); *see* N.C. Gen. Stat. § 131E-

101(6) (defining a nursing home). The statute provides that

[t]he proceedings of a quality assurance, medical, or peer review committee, the records and materials it produces and the materials it considers shall be confidential and not considered public records within the meaning of G.S. 132-1, "'Public records' defined", and shall not be subject to discovery or introduction into evidence in any civil action against a nursing home . . . that results from matters that are the subject of evaluation and review by the committee . . . . However, information, documents, or records otherwise available are not immune from discovery or use in a civil action merely because they were presented during proceedings of the committee. Documents otherwise available as public records within the meaning of G.S. 132-1 do not lose their status as public records merely because they were presented or considered during proceedings of the committee.

N.C. Gen. Stat. § 131E-107(b). Further, a quality assurance committee is defined as " a committee,

agency, or department of a . . . nursing home . . . that is formed for the purpose of evaluating the

quality, cost of, or necessity for health care services under applicable federal and State statutes,

regulations, and rules." N.C. Gen. Stat. § 131E-101(8).

In discussing the quality assurance privilege, the North Carolina Court of Appeals

"conclude[d] that the plain language of section 131E-107 protects only those records which were

*actually* a part of the team's proceedings, produced by the team, or considered by the team." *Hayes*,

181 N.C. App. at 752, 641 S.E.2d at 319. However, the court was clear that "[t]he title, description,

or stated purpose attached to a document by its creator is not dispositive, nor can a party shield an

*otherwise available* document from discovery merely by having it presented to or considered by a

quality review committee." *Id.* (citing N.C. Gen. Stat. § 131E-107). The party asserting the quality

assurance privilege bears the burden of proof to demonstrate that the privilege applies. *Id.* at 751-53, 641 S.E.2d at 318-19 (holding that the party asserting the quality assurance privilege failed to meet its burden of proof to demonstrate that the records in question were either part of the quality assurance committee's proceedings, produced by the quality assurance team, or considered by the quality assurance committee where the party simply argued that the quality assurance team could review the reports and might do so in the future).

The North Carolina Court of Appeals has also discussed the applicability of the "otherwise available" language, stating that "if the material sought to be discovered or introduced at trial falls within the first two categories of information under N.C. Gen. Stat. § 131E-95, the material is absolutely protected and cannot later become 'otherwise available.'"[1] *Woods v. Moses Cone Health Sys.*, 198 N.C. App. 120, 127, 678 S.E.2d 787, 792 (2009) (citing *Shelton v. Morehead Mem'l Hosp.*, 318 N.C. 76, 82, 347 S.E.2d 824, 828 (1986)). "[I]nformation, in whatever form available, from original sources other than the medical review committee is not immune from discovery or use at trial merely because it was presented during medical review committee proceedings." *Shelton*, 318 N.C. at 83, 347 S.E.2d at 829 (citation omitted). "The statute is designed to encourage candor and objectivity in the internal workings of medical review committees. Permitting access to information not generated by the committee itself but merely presented to it does not impinge on this statutory purpose." *Id.* Thus, where the information sought is the proceedings of a quality assurance committee or the records and materials produced by the quality assurance committee, that

---

[1] The court in *Woods* discussed a similar privilege applicable to hospital medical review committees, however, the relevant statutory language is identical to the quality assurance privilege. *See* N.C. Gen. Stat. § 131E-95(b) ("The proceedings of a medical review committee, the records and materials it produces and the materials it considers shall be confidential . . . and shall not be subject to discovery or introduction into evidence in any civil action . . . which results from matters which are the subject of evaluation and review by the committee.").

information is absolutely privileged even thought it might be otherwise available. *See Woods*, 198 N.C. App. at 127-28, 678 S.E.2d at 792-93 (holding that a letter from a doctor to the chairperson of the hospital's peer review committee was absolutely privileged and was not subject to discovery even though it had been provided to parties outside of the medical review committee "because the letter was produced at the request of a medical review committee" when the medical review committee specifically directed a written request to the doctor for information); *accord Hurst v. Creasman*, No. C-88-345-D, 1989 WL 151660, at *5 (M.D.N.C. Aug. 23, 1989) (unpublished) (in response to defendant's argument that plaintiff should have to obtain otherwise available records from a source other than the medical review committee, directing the defendant "to produce the information which originated from a source other than the committee and was not prepared at the direction or behest of the committee specifically for its use. In this way, the information would be discoverable, yet the material prepared by or for the committee would not be revealed.").

When analyzing whether information collected by a non-protected committee later becomes protected as a result of a statutorily-protected committee considering the information, the nature of the information is critical.

> Just as the attorney-client privilege has been found to not extend to preliminary investigations conducted by attorneys for insurance companies, North Carolina case law reveals that hospitals will not be able to use the peer-review committee as a "privilege" clearinghouse for protecting otherwise discoverable information. *Virmani v. Presbyterian Health Servs.*, 127 N.C. App. 629 (1997). The privilege does not extend to the gathering of raw data by a hospital's "risk-management team," but does protect briefing done by the risk-management team for the exclusive use of the peer-review committee and the actual deliberations, thought processes, opinions, decisions, and work product of the peer-review committee.

*Erney v. Welliver*, No. 1:99CV74-T, 2000 WL 33422745, at *2 (W.D.N.C. Mar. 13, 2000) (unpublished). The *Erney* court considered, among other items, whether occurrence reports and

8

summaries of occurrence reports were protected by N.C. Gen. Stat. § 131E-95. *Id.* The court determined that the occurrence reports "appear to be gathered in the ordinary course of a hospital's business as a way of fielding complaints from patients, their families, and staff members. While they certainly could be used for peer review, they appear to also be gathered for true 'risk management,' which is corporate liability." *Id.* The court held that the occurrence reports were not privileged and ordered that they be disclosed. *Id.* In contrast, however, the court determined that the summaries of occurrence reports were "not unlike a brief that would be prepared by staff for a judge, summarizing the written arguments of counsel." *Id.* The court held that the summaries were privileged and not subject to disclosure. *Id.*

Here, the documents in question are the safety audits, the Safety Team Committee meeting minutes, and the Safety Team Committee Toolkit. Pls.' Third Req. for Prod. [DE-25-1] at 1-3. Defendant's Safety Team Committee, per the "Safety Team Committee Policy," "provides and maintains a safe and healthy work and facility environment by emphasizing training, preventative measures and post incident processes that reduce the severity of loss." [DE-26-5] at 1. Further, "[t]he Safety Team Committee is authorized to oversee the safety program at the facility. The Safety Team Committee works independently of and provides data to the Quality Assurance & Performance Improvement (QAPI) Committee." *Id.* The policy also provides that "[a]ll forms, reports, and data are collected for the purpose of studying quality of care issues and are protected under the Health Care Quality Improvement Act." *Id.* at 1, 4. The policy directs the Safety Team Committee to "[u]se the Safety Team standing agenda, accountabilities, [sic] tasks, and assignments, from the *Safety Team Committee Toolkit*." *Id.* at 2. Regarding meeting minutes, the policy notes the following: "[t]he committee maintains documentation of meetings, findings, and recommended corrective

9

summaries of occurrence reports were protected by N.C. Gen. Stat. § 131E-95. *Id.* The court determined that the occurrence reports "appear to be gathered in the ordinary course of a hospital's business as a way of fielding complaints from patients, their families, and staff members. While they certainly could be used for peer review, they appear to also be gathered for true 'risk management,' which is corporate liability." *Id.* The court held that the occurrence reports were not privileged and ordered that they be disclosed. *Id.* In contrast, however, the court determined that the summaries of occurrence reports were "not unlike a brief that would be prepared by staff for a judge, summarizing the written arguments of counsel." *Id.* The court held that the summaries were privileged and not subject to disclosure. *Id.*

Here, the documents in question are the safety audits, the Safety Team Committee meeting minutes, and the Safety Team Committee Toolkit. Pls.' Third Req. for Prod. [DE-25-1] at 1-3. Defendant's Safety Team Committee, per the "Safety Team Committee Policy," "provides and maintains a safe and healthy work and facility environment by emphasizing training, preventative measures and post incident processes that reduce the severity of loss." [DE-26-5] at 1. Further, "[t]he Safety Team Committee is authorized to oversee the safety program at the facility. The Safety Team Committee works independently of and provides data to the Quality Assurance & Performance Improvement (QAPI) Committee." *Id.* The policy also provides that "[a]ll forms, reports, and data are collected for the purpose of studying quality of care issues and are protected under the Health Care Quality Improvement Act." *Id.* at 1, 4. The policy directs the Safety Team Committee to "[u]se the Safety Team standing agenda, accountabilities, [sic] tasks, and assignments, from the *Safety Team Committee Toolkit*." *Id.* at 2. Regarding meeting minutes, the policy notes the following: "[t]he committee maintains documentation of meetings, findings, and recommended corrective

9

actions. *This documentation is reviewed by the QAPI Committee.*" *Id.* at 3. "Minutes of meetings contain, at a minimum, the following: [d]ate and time of meeting; [f]indings and recommended corrective action; [f]ollow-up action plans, as appropriate; and [a]ny other information deemed appropriate by the committee." *Id.* The Safety Team Committee is directed to [c]omplete the Meeting Summary form and submit to the QAPI Committee along with a copy of the Minutes . . . . Attendance Report, Minutes, and Meeting Summary are maintained in the Safety Team Committee Toolkit binder." *Id.*

As to the safety audits, the policy directs the Safety Team Committee to "[c]omplete safety audits for every department (OP2 0401.01 A2 thru L2) no less than monthly." *Id.* The "Safety Audit" for "Entrance & Grounds" directs that it should be completed quarterly, and states that it "has been generated as part of the facility's Quality Assessment and Assurance process and constitutes confidential Quality Assessment and Assurance Committee Records. Ref 42 USC §§ 1395i-3(b)(1)(B) and 1396r(b)(1)(B) and 42 CFR § 483.75(O)." [DE-26-3]. Additionally, the Safety Self-Audit Guide provides that when completing the safety audits, "[a]ll concerns should be reported to the appropriate department head for follow-up and corrective action as necessary;" "[t]he team member reports the findings to the Safety Team Committee;" and "[r]oot cause analysis is to be conducted by the Safety Team Committee on any trends identified." [DE-26-4] at 1.

Francis Dowgos ("Dowgos"), the director of maintenance at the nursing home, testified at his deposition about the relationship between the Safety Team Committee and the QAPI Committee. Dowgos Dep. [DE-26-7] at 6, 16-24.[2] Dowgos testified that he was a member of both the Safety

---

[2] Excerpts of the Dowgos Deposition were also filed as an attachment to Defendant's memorandum in support of its response to the motion to compel. [DE-33-5].

Team Committee and the QAPI Committee. *Id.* at 16-17. The Safety Team Committee meets once a month, separately from the QAPI Committee, and looks over safety trends from the previous month, including employee and resident injuries, completes audits, and discusses emergency drills and safety issues. *Id.* at 17-18. The Safety Team Committee is made up of the administrator, the director of nursing, the staff development coordinator, the director of maintenance, the housekeeping supervisor, the dietary manager, and formerly included a representative from Human Resources. *Id.* at 17. Dowgos testified that there are members of the QAPI Committee who are not also members of the Safety Team Committee. *Id.* at 18.

The QAPI Committee meets once a month as well, usually after the Safety Team Committee meeting has taken place. *Id.* at 17. The QAPI Committee is made up of the administrator, the director of nursing, the staff development coordinator, the therapy manager, the facility doctor, the physician's assistants, "their director of maintenance," the pharmacist, and the social worker. *Id.* at 18. Dowgos testified that he presents the Safety Team Committee meeting minutes during the QAPI Committee meetings, and when asked what the QAPI Committee does, responded "[f]rom my part, I just give them the minutes of the safety meeting, um and then, um, they discuss, uh, medications and – and– and other things, you know, more – more of a, uh – a medical." *Id.* at 17, 19.

As to the safety audits, Dowgos testified that members of the Safety Team Committee completed safety audits for twelve different locations at the nursing home and discussed those audits during their meetings. *Id.* at 19. Dowgos gives each member of the Safety Team Committee a safety audit to complete prior to the next meeting, although he has at times completed safety audits himself. *Id.* at 19-20. Dowgos testified that he usually lets the members volunteer to complete the different audit forms, although if no one volunteers for a particular form he will assign it to a member. *Id.*

11

at 20-21. After the safety audits are completed, the team members return the forms to Dowgos at the next monthly meeting. *Id.* at 21-22. Dowgos keeps the completed audits in a meetings binder in his office in the maintenance shop, which is also accessible to Dowgos's administrator and the housekeeping supervisor. *Id.* at 22. Dowgos has a binder for each year, and he believes he has binders dating back to 2007. *Id.* Dowgos testified that the binders should contain all of the safety audits that were completed every quarter, although he has not verified that all the audits are present. *Id.* at 23. If a particular audit were missing, either the Safety Team Committee member responsible for completing the audit did not return the audit or did not complete the audit. *Id.* Dowgos testified that he did not discuss the safety audit of the entrance and grounds with anyone outside of the Safety Team Committee, and did not receive any instructions about how to fill out the safety audit forms. *Id.* at 23-24.

On cross-examination at the deposition, Dowgos stated that the safety audit of the entrance and grounds took place quarterly, and once completed, was turned in to the administrator and the QAPI Committee. *Id.* at 39-40. When asked whether the safety audit was part of the nursing home's quality assurance process, and whether Dowgos had "personal knowledge of that because you serve both in your capacity as maintenance director on conducting safety audits and also participating in the quality assurance committee," Dowgos responded to both questions in the affirmative. *Id.* at 40.

The issue for resolution here is whether Defendant has met its burden of demonstrating that the Safety Team Committee meeting minutes, toolkit, and safety audits were either part of a quality assurance committee's proceedings, produced by a quality assurance committee, or considered by the quality assurance but not otherwise available. *Hayes*, 181 N.C. App. at 752, 641 S.E.2d at 319. As an initial matter, it is undisputed that the nursing home owned and operated by Defendant meets

12

the statutory definition in N.C. Gen. Stat. § 131E-101(6), and that the QAPI Committee is a quality assurance committee as defined in N.C. Gen .Stat. § 131E-101(8). However, the records in question were produced by the Safety Team Committee, not the QAPI Committee. Defendant does not argue that the Safety Team Committee is a quality assurance committee as defined by North Carolina law, and the Safety Team Committee's policy demonstrates that it is not a protected quality assurance committee. *Compare* N.C. Gen. Stat. § 131E-101(8) (defining a quality assurance committee as being "formed for the purpose of evaluating the quality, cost of, or necessity for health care services under applicable federal and State statutes, regulations, and rules"), *with* Safety Team Committee Policy [DE-26-5] at 1 (the Safety Team Committee "provides and maintains a safe and healthy work and facility environment by emphasizing training, preventative measures and post incident processes that reduce the severity of loss" and "is authorized to oversee the safety program at the facility."). Dowgos also testified that the Safety Team Committee meets separately from the QAPI Committee, considers safety trends including employee and resident injuries, completes safety audits, and discusses emergency drills and safety issues. Dowgos Dep. [DE-26-7] at 17-18. Accordingly, based on the written policy of the Safety Team Committee and Dowgos's testimony, the court determines that the Safety Team Committee is not a quality assurance committee as defined by N.C. Gen. Stat. § 131E-101(8).

Accordingly, as the records in question were produced by the Safety Team Committee and not by a protected quality assurance committee, the records cannot have been part of a quality assurance committee's proceedings. *See Hayes*, 181 N.C. App. at 752, 641 S.E.2d at 319 ("section 131E-107 protects only those records which were *actually* a part of the team's proceedings, produced by the team, or considered by the team."); N.C. Gen. Stat. § 131E-107(b) ("[t]he proceedings of a

13

quality assurance ... committee, the records and materials it produces and the materials it considers shall be confidential"). The evidence presented demonstrates that the meeting minutes and completed safety audit forms were produced by members of the Safety Team Committee. *See* Safety Team Committee Policy [DE-26-5] at 3. Defendant did not present evidence as to what entity produced the Safety Team Committee Toolkit, as requested in Plaintiffs' Request for Production # 5. Accordingly, the court cannot hold that the Safety Team Committee Toolkit is protected by the quality assurance privilege, based on this record and where Defendant bears the burden of proof. *See Hayes*, 181 N.C. App. at 751-53, 641 S.E.2d at 318-19. Further, while Defendant objected to Plaintiff's Request for Production # 6 seeking incident reports and asserted the quality assurance privilege, Defendant only argues that the incident reports are protected by HIPAA in response to the motion to compel and does not provide any evidence as to the author of the incident reports. Def.'s Mem. [DE-33] at 14-17. The court thus cannot conclude on this record that the incident reports are protected by the quality assurance privilege. As to Plaintiffs' Request for Production #8, seeking checklists showing periodic maintenance, Defendant characterizes this request as also seeking completed safety audit forms. Def.'s Mem. [DE-33] at 3.

Even though the Safety Team Committee Policy provides that "[a]ll forms, reports, and data are collected for the purpose of studying quality of care issues and are protected under the Health Care Quality Improvement Act," [DE-26-5] at 1, 4, and the safety audit forms provide that the audits are being "generated as part of the facility's Quality Assessment and Assurance process and constitutes confidential Quality Assessment and Assurance Committee Records," [DE-26-3], this labeling is not dispositive. "The title, description, or stated purpose attached to a document by its creator is not dispositive, nor can a party shield an *otherwise available* document from discovery

14

merely by having it presented to or considered by a quality review committee." *Hayes*, 181 N.C. App. at 752, 641 S.E.2d at 319.

Here, given the evidence presented, Defendant has failed to prove that the records sought by Plaintiffs are protected from discovery from the quality assurance privilege. The Safety Team Committee Policy provides that the Safety Team Committee "works independently of and provides data to the [QAPI] Committee." [DE-26-5] at 1. Further, Dowgos testified that the Safety Team Committee meets independently of the QAPI Committee, and the Safety Team Committee and the QAPI Committee are not comprised of the same members. Dowgos Dep. [DE-26-7] at 17-18. While Dowgos does present the Safety Team Committee meeting minutes and completed safety audit forms to the QAPI Committee, he also testified that he keeps the completed safety audit forms in Safety Team Committee meetings binders in his office. *Id.* at 21-22, 39-40. Dowgos also stated that he did not discuss the safety audit of the entrance and grounds with anyone outside of the Safety Team Committee, and he did not receive any instructions about how to complete the safety audit forms. *Id.* at 23-24. Thus, based on this evidence, the court determines that the records sought by Plaintiffs were not "not prepared at the direction or behest of the [QAPI Committee] specifically for its use." *Hurst*, 1989 WL 151660, at *5. The meeting minutes and the completed audit forms certainly assist the Safety Team Committee in its own independent functions, namely reviewing safety trends from the previous months at its meetings, and discussing completed safety audits and safety issues, and nothing indicates that any of the records sought were authored in response to a specific request from the QAPI Committee. Dowgos Dep. [DE-26-7] at 17-18; *see Woods*, 198 N.C. App. at 127-28, 678 S.E.2d at 792-93 (holding that a letter written by a doctor and sent to the chairperson of a peer review committee was "produced at the request of a medical review

15

committee" and privileged where the letter was sent in response to a specific written request from the committee to the doctor for information). The evidence presented shows that the records sought by Plaintiffs contain "information . . . from original sources other than [a quality assurance committee, which] is not immune from discovery or use at trial merely because it was presented during [quality assurance] committee proceedings." *Shelton*, 318 N.C. at 83, 347 S.E.2d at 829 (citation omitted). Further, none of the evidence presented shows that the records sought by Plaintiffs contain briefing and analysis performed by the Safety Team Committee "for the exclusive use" of the QAPI Committee, which would be protected by the quality assurance privilege. *Erney*, 2000 WL 33422745, at *2. Accordingly, the Safety Team Committee meeting minutes, toolkit, and completed safety audit forms are not privileged and are discoverable, and shall be produced to the Plaintiffs by **August 26, 2015**.

As to the incident reports, Defendant contends that Plaintiffs' request is overly broad and unduly burdensome, and argues that Defendant might be subject to penalties for producing individually identifiable protected health information pursuant to HIPAA. Def.'s Mem. [DE-33] at 14-17. Defendant states that "in order to produce the requested Incident/Accident reports [Defendant] would have to comb through thousands of Incident/Accident reports, then examine them to determine if they meet the proper criteria. This would be a massive undertaking, potentially involving the medical records of hundreds of [nursing home] residents." *Id.* at 15. First, as to Defendant's brief assertion that it would have to comb through an unknown number of records, Defendant has failed to provide any information as to the cost of searching for and producing the requested documents beyond its boilerplate objection. Defendant has thus failed to carry its burden in showing that discovery of the incident/accident reports is too burdensome to be had. *See*

16

*Mainstreet Collection, Inc. v. Kirkland's, Inc.*, 270 F.R.D. 238, 240 (E.D.N.C. 2010) (recognizing that boilerplate objections are not proper). However, to the extent that the Plaintiffs are seeking "[a]ll documents that relate to any accidents or injuries sustained by any Resident of the Nursing Home on the exterior premises of the Nursing Home in the two years prior to July 21, 2013," Pls.' Third Req. for Prod. [DE-25-1] at 3, the court determines that good cause exists to limit this request. This request shall be limited to documents relating to accidents or injuries sustained by any resident of the nursing home **relating to the handicap ramp at issue** in this case, in the two years prior to July 21, 2013.

Further, as to Defendant's HIPAA objection, Defendant's argument is without merit. 45 C.F.R. § 164.512 allows for the disclosure of protected health information in response to a discovery request or a court order, as long as a qualified protective order is in place. *See* 45. C.F.R. § 164.512(e)(1)(v) (describing the requirements of a qualified protective order). Accordingly, the parties shall have until **August 19, 2015** to present to the court a motion for a HIPAA-qualified protective order. Within **three weeks** of the date of entry of a HIPAA-qualified protective order, Defendant shall produce all documents responsive to the request as limited above.

Sanctions are available in conjunction with a motion to compel discovery. Fed. R. Civ. P. 37(a)(5) (providing for sanctions if the court grants, denies, or grants in part and denies in part a motion to compel). The rule provides, however, that the court should not award sanctions if "other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(A)(iii) & (B). Further, "the imposition of discovery sanctions is generally within the sound discretion of the trial court." *Billips v. N.C. Benco Steel, Inc.*, No. 5:10-CV-095-RLV-DCK, 2011 WL 34416, at *5 (W.D.N.C. Aug. 8, 2011) (unpublished) (internal citations and quotation omitted). Based on the nature of the

17

instant dispute, the court determines that sanctions are unwarranted and no sanctions will be awarded in conjunction with Plaintiffs' motion to compel.

**2.      Defendant's Motion to File Document Under Seal [DE-35]**

On June 19, 2015, Defendant filed a Motion to File Document Under Seal, seeking to file Exhibit 1 to Defendant's Memorandum in Support of Response to Motion to Compel [DE-33] under seal. Exhibit 1 is a compilation of decedent David Jackson's medical records. [DE-33-1, -34]. In support of its motion to seal, Defendant argues that "[t]he personal medical information of Mr. Jackson is considered confidential and protected by the Health Insurance Portability and Accountability Act of 1996 (or 'HIPAA')." Def.'s Mot [DE-33] at 1. Plaintiffs did not file a response within the allotted time.

The Fourth Circuit has directed that before sealing publicly filed documents the court must first determine if the source of the public's right to access the documents is derived from the common law or from the First Amendment. *Stone v. Univ. of Md.*, 855 F.2d 178, 180 (4th Cir. 1988). The fact that the documents sought to be sealed are subject to a protective order by the court does not relieve the parties or the court from the obligation to comply with the Fourth Circuit's sealing regimen. *See Hall v. United Air Lines, Inc.*, 296 F. Supp. 2d 652, 679-80 (E.D.N.C. 2003); *see also Volumetrics Med. Imaging, LLC v. Toshiba Am. Med. Sys., Inc.*, No. 1:05CV955, 2011 WL 2413404, at *5 (M.D.N.C. June 10, 2011) (unpublished) (citations omitted). "[T]he common law presumption in favor of access attaches to all 'judicial records and documents,' [while] the First Amendment guarantee of access has been extended only to particular judicial records and documents[,]" such as those filed in connection with a motion for summary judgment. *Stone*, 855 F.2d at 180 (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978) & citing *Rushford*

*v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988); *In re Washington Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986)). Here, the documents Defendant seeks to seal relate to Plaintiffs' motions to compel discovery, rather than to motions seeking dispositive relief, and therefore the right of access at issue arises under the common law. *See Covington v. Semones*, No.7:06CV00614, 2007 WL 1170644, at \*2 (W.D. Va. Apr. 17, 2007) (unpublished) ("In this instance, as the exhibits at issue were filed in connection with a non-dispositive motion, it is clear there is no First Amendment right of access.").

The presumption of access under the common law is not absolute and its scope is a matter left to the discretion of the district court. *Va. Dep't of State Police v. Washington Post*, 386 F.3d 567, 575 (4th Cir. 2004). This presumption "'can be rebutted if countervailing interests heavily outweigh the public interests in access,' and '[t]he party seeking to overcome the presumption bears the burden of showing some significant interest that outweighs the presumption.'" *Id.* (quoting *Rushford*, 846 F.2d at 253). Some factors for consideration when analyzing the common law presumption of access "include whether the records are sought for improper purposes, such as promoting public scandals or unfairly gaining a business advantage; whether release would enhance the public's understanding of an important historical event; and whether the public has already had access to the information contained in the records." *Id.* (quoting *In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984)). Here, the documents in question constitute confidential medical records, which are of utmost importance to the parties, but such documents are not generally available to the public. Based on this showing, the court determines that the common law presumption of access has been overcome.

In addition, the public must be given notice of a request to seal and a reasonable opportunity

19

to challenge the request. *In re Knight*, 743 F.2d at 235 (citing *In re Knoxville News-Sentinel Co.*, 723 F.2d 470, 474-76 (6th Cir. 1983)). Here, Defendant's motion to seal was filed on June 19, 2015. Def.'s Mot. [DE-35]. No opposition to the motion has been filed by the Plaintiffs or any non-party, despite a reasonable time in which to do so.

Finally, the court is obligated to consider less drastic alternatives to sealing, and where a court decides to seal documents, it must "state the reasons for its decision to seal supported by specific findings, and the reasons for rejecting alternatives to sealing in order to provide an adequate record for review." *Id.* (citation omitted). Because, as described above, the exhibit in question contains confidential information and consists of medical records that are not generally available to the public, the court determines that alternatives to sealing do not exist at the present time. Accordingly, Defendant's Exhibit 1 to Defendant's Memorandum in Support of Response to Motion to Compel (located at DE-33-1; -34) shall be sealed in accordance with Local Civil Rule 79.2.

## CONCLUSION

It is therefore ordered that Plaintiffs' motion to compel [DE-25] is GRANTED and Defendant's motion to seal [DE-35] is GRANTED.

1. Defendant shall produce the Safety Team Committee meeting minutes, toolkit, and completed safety audit forms to the Plaintiffs by **August 26, 2015**;

2. The parties shall move for a HIPAA-qualified protective order no later than **August 19, 2015**;

3. Within **three weeks** of the entry of a HIPAA-qualified protective order, Defendant shall produce all documents relating to any accidents or injuries sustained by any resident of the nursing home **relating to the handicap ramp at issue in this case** in the two years prior to July 21, 2013; and

4. Defendant's Exhibit 1 to Defendant's Memorandum in Support of Response to Motion to Compel (located at DE-33-1; -34) shall remain under seal.

20

SO ORDERED, this the  5  of August 2015.

Robert B. Jones, Jr.
United States Magistrate Judge