IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:14-CV-00161-FL

| | |
|---|---|
| GWENDOLYN JACKSON PINNIX, Executor of The Estate of David W. Jackson, Sr. and; WARREN IVAN JACKSON, Executor of The Estate of David W. Jackson, Sr., <br><br> Plaintiffs, <br><br> v. <br><br> SSC SILVER STREAM OPERATING COMPANY LLC, <br><br> Defendant. | ORDER |

This matter is before the court on plaintiffs' motion to strike testimony of defendant's experts Gregory A. Compton, M.D. ("Compton") and William R. Oliver, M.D. ("Oliver") (DE 68), and defendant's motion to strike testimony of plaintiffs' expert Thomas D. Owens, M.D. ("Owens") (DE 70), pursuant to Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). The motions have been briefed fully, and in this posture, the issues raised are ripe for ruling. For the reasons that follow, the motions are denied.

## BACKGROUND

Plaintiffs, executors of the estate of David W. Jackson ("decedent"), filed this wrongful death action in the Superior Court of New Hanover County, North Carolina on June 27, 2014, against defendants SSC Silver Stream Operating Co., L.L.C. ("SSC") and Sava SeniorCare L.L.C. ("Sava").

Plaintiffs also assert claims against defendants for administrative and corporate medical malpractice, in violation N.C. Gen. Stat. § 90-21.11(2), and common law negligence. Defendants timely removed the action on August 6, 2014, invoking this court's diversity of citizenship jurisdiction under 28 U.S.C. §§ 1332, 1441, and 1446.

On August 20, 2014, defendant SSC answered the complaint, denying liability and raising a number of affirmative defenses. (DE 12). That same date, defendant Sava filed a motion to dismiss for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). (DE 13). The parties voluntarily dismissed defendant Sava as party to the action on September 11, 2014. (DE 18).

During discovery, plaintiffs identified Dr. Owens as an expert to testify as to decedent's cause of death. Defendant identified Drs. Compton and Oliver as experts to testify as to certain events surrounding decedent's death.[1] On September 30, 2016, plaintiffs filed the instant motion to strike the testimony of Drs. Compton and Oliver on the basis that the doctors' opinions are unreliable and will not assist the trier of fact. On October 7, 2016, defendant SSC filed the instant motion to strike testimony of Dr. Owens on the basis that Dr. Owens's opinion is unreliable.

## STATEMENT OF FACTS

According to the complaint, defendant SSC owns and operates Silver Stream Health and Rehabilitation Center ("Silver Stream"), a nursing home and rehabilitation center located in Wilmington, North Carolina. (DE 1-1 ¶ 19). Decedent was admitted to Silver Stream on April 15, 2013, for rehabilitation and physical and occupational therapy. (Id. ¶ 19). At the time of admission,

---

[1]As discussed more thoroughly herein, because Drs. Compton and Oliver have different specialties, the reasoning behind their opinions varies slightly. Notwithstanding these differences, the doctors ultimately reach the same conclusion regarding events preceding decedent's death.

decedent was 83 years old and had multiple medical conditions including dementia, obesity, anemia, and diabetes, among others. (Id. ¶ 20) When he was admitted to Silver Stream, decedent was assessed as being at risk for falls. (Id.). In fact, decedent was admitted to Silver Stream, in part, to learn how to use a motorized wheelchair. (Id. ¶ 21).

From April 15, 2013, until approximately June 10, 2013, an occupational therapist taught decedent how to use a motorized wheelchair. (Id. ¶ 22). By June 10, 2013, decedent no longer required occupational therapy for wheelchair mobility, (Id. ¶ 23), however he did still require supervision when using his motorized wheelchair. (Id. ¶ 24).

At approximately 12:10 p.m. on July 21, 2013, decedent was operating his motorized wheelchair at Silver Stream unsupervised. (Id. ¶ 25). While unsupervised, decedent drove his motorized wheelchair out the front door of Silver Stream. (Id.). No one on Silver Stream's staff saw decedent exit the facility. (Id.). According to plaintiffs, once decedent exited the facility, he attempted to drive himself down a wheelchair ramp that led to the parking lot. (Id.). However, the wheelchair ramp was not clearly marked. (Id.). As a result, decedent's wheelchair rolled over the curb and became unstable. (Id.). This instability caused decedent to fall out of the wheelchair, directly onto his face and head. (Id.).

As a proximate result of injuries sustained from his fall on July 21, 2013, decedent passed away on July 26, 2013. (Id. ¶ 26).

## DISCUSSION

A.  Standard of Review

Federal Rule of Evidence 702 governs the admissibility of expert opinion testimony. Under Rule 702, expert testimony is appropriate when "the expert's scientific, technical, or other

3

specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. A witness qualified as an expert may be permitted to testify where "(b) the testimony is based upon sufficient facts or data, (c) the testimony is the product of reliable principles and methods, and (d) the expert has reliably applied the principles and methods to the facts of the case." Id.

Courts have distilled the requirements of Rule 702 into two crucial inquiries: 1) whether the proposed expert's testimony is relevant; and 2) whether it is reliable. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999); Daubert, 509 U.S. at 589; see Nease v. Ford Motor Co., __F.3d__, 2017 WL 437665, at *6 (4th Cir. 2017). The trial court must carry out the special gate-keeping obligation of ensuring that expert testimony meets both requirements. Kumho Tire, 526 U.S. at 147.

The test of "relevance" considers whether the proposed expert testimony will help the jury in resolving a factual dispute. Daubert, 509 U.S. at 591. Expert testimony "is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir. 1993).

The reliability inquiry is a "flexible one focusing on the principles and methodology employed by the expert, not on the conclusions reached." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999) (internal quotations omitted). In assessing whether expert testimony is "reliable," the court may consider:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the techniques' operation; and (5) whether the technique has received general acceptance within the relevant scientific or expert community.

United State v. Crisp, 324 F.3d 261, 266 (4th Cir. 2003) (quoting Daubert, 509 U.S. at 593–94) (quotation marks omitted); see also Nease, 2017 WL 437665, at *6. These factors, however, are not exclusive and "the court has broad latitude to consider whatever factors bearing on validity that the court finds to be useful[,] . . . depend[ing] upon the unique circumstances of the expert testimony involved." Westberry, 178 F.3d at 261 (citing Kumho Tire, 526 U.S. at 151).

The proponent of expert testimony must establish its admissibility by a preponderance of proof. Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001). Review by the advisory committee indicates that rejection of expert testimony is the exception rather than the rule. Fed. R. Evid.702 advisory committee's note to 2000 amendment.

B. Analysis

    1. Drs. Compton and Oliver

Plaintiffs move to exclude testimony from Drs. Compton and Oliver that decedent suffered a cardiac event prior to falling from his wheelchair on July 21, 2013.[2] Plaintiffs assert four grounds for exclusion: 1) the doctors' opinions will not help the jury; 2) the opinions are not based on sufficient facts or data; 3) the opinions are not based on reliable principles and methods; and 4) the doctors did not reliably apply appropriate principles and methods in this case. The court first addresses whether the doctors' opinions will be helpful to the jury.

        a. Helpfulness

Plaintiffs first challenge the relevance of the doctors' opinions by arguing that they will not be helpful to the trier of fact. See Fed. R. Evid. 702(a). Plaintiffs contend that because the doctors'

---

[2] Plaintiffs do not dispute that decedent suffered a cardiac event on July 21, 2013. Rather, plaintiffs only contest that such cardiac event occurred prior to the time decedent fell from his wheelchair.

5

opinions are not supported by any medical or scientific evidence, Drs. Compton and Oliver do not utilize "any specialized knowledge that will help the jury determine whether [decedent] had a cardiac event or was unconscious prior to falling from his wheelchair." (DE 68 at 11). The court disagrees.

An expert may not ground his or her opinion in sensibilities common to the average juror. See United States v. Perkins, 470 F.3d 150, 155–56 (4th Cir. 2006) ("[A]n expert witness must possess some specialized knowledge or skill or education that is not in the possession of the jurors."); Scott v. Sears, Roebuck & Co., 789 F.2d 1052, 1055 (4th Cir. 1986) ("Rule 702 makes inadmissible expert testimony as to a matter which obviously is within the common knowledge of the jurors, because such testimony, almost by definition, can be of no assistance."). Rather, the opinion must be a product of the expert's expertise. See Perkins, 470 F.3d at 155–56. Thus, where a person with no special skill or experience can draw the same conclusion as the proffered expert after only brief exposure to the relevant evidence, the expert's opinion must be excluded as unhelpful. See SMD Software, Inc. v. EMove, Inc., 945 F. Supp. 2d 628, 640 (E.D.N.C. 2013).

The doctors' testimony will be helpful to the jury. As a preliminary matter, Drs. Compton and Oliver are both well-qualified to testify as to decedent's pre-mortem cardiac event. Dr. Compton is board certified in internal medicine, geriatric medicine and hospice and palliative care medicine and has significant experience with nursing home patients presenting cognitive defects and multiple co-morbidities. He also has extensive experience managing patients with traumatic brain injury. Dr. Oliver is also well-qualified to testify. Dr. Oliver is board certified in forensic pathology and has extensive experience determining the cause and manner of death.

After reviewing decedent's medical records, deposition testimony from decedent's treating

6

physician, Mary Rudyk, M.D., records from decedent's admission to NHRMC on July 21, 2013, EMS reports, photographs of decedent, and other information presented to them,[3] Drs. Compton and Oliver both reached the conclusion that decedent suffered a cardiac event before he fell from his wheelchair on July 21, 2013. Although some of the assumptions underlying their opinions may be readily understood by lay persons, in explaining why decedent's cardiac event occurred prior to his fall, the doctors will rely on their medical knowledge and expertise to educate the jury and assist in their understanding of the case. See Fed. R. Evid. 702, advisory committee's note to the 2000 amendment.

Plaintiffs contend that the doctors did not rely on their medical expertise in arriving at their conclusions regarding decedent's cardiac event. Specifically, plaintiffs argue that because the doctors' opinions are based on 1) decedent's high risk for a cardiac event; 2) decedent's ability to safely operate his wheelchair; and 3) the lack of documented abrasions to decedent's hands, wrists, elbows, or knees, the doctors did not rely on specialized knowledge to form their opinions. (See DE 69) ("There is no dispute that Jackson was at high risk of sudden cardiac event. . . . The jury can certainly determine whether Jackson was skilled at operating his wheelchair. . . . The jury can easily conclude whether Jackson had abrasions on his hands. The [j]ury can take these facts and, using common sense and logic, conclude that Jackson likely suffered a cardiac event or was unconscious . . . ."). To support this position, plaintiffs note that in his deposition, Dr. Compton testified that nothing in decedent's medical record supports his opinion that decedent had a cardiac event prior

---

[3] In addition to the materials listed, Dr. Compton also reviewed deposition testimony from Jackson, unsworn witness statements given by Silver Stream staff, the expert reports of Dr. Owens, Kate Cogan, R.N., and James Ian Ebert, PhD, and information relating to Silver Stream's nursing facility. Dr. Oliver also reviewed Dr. Owens's report.

7

to falling out of his wheelchair. (DE 69; DE 69-15 at 25).

Contrary to plaintiffs' suggestion, Drs. Compton and Oliver do rely on medical evidence to support their opinions. For instance, in his report Dr. Compton explains:

> The fall event of 7/21/2013 occurred secondary to and as a result of cardiac PEA arrest. It is my opinion that [decedent] was unconsciousness [sic] at the time he fell out of the chair. When the EMS personnel arrived on the seen [sic] to provide ACLS care to [decedent], he was found with agonal respirations and his cardiac rhythm was PEA. . . . The fall and head trauma did not cause the PEA arrest. The CT scan done on 7/21/2013, upon arrival at NHRMC, showed no bleeding into [decedent's] brain, absence of brain swelling or midline shift. The CT findings rules [sic] out head trauma as a cause of cardio-pulmonary arrest. Concussive injury can cause loss of consciousness but not cardiac arrest unless there is impingement of the brain stem. Lack of midline shift obviates any risk of brainstem impingement or herniation.

(DE 69-13 at 4). As evidenced in his report, decedent's condition at the time EMS arrived and decedent's CT scan results both factored into Dr. Compton's medical opinion. Additionally, Dr. Oliver considered decedent's injuries and heart arrhythmias in arriving at his conclusions regarding decedent's cardiac event. Accordingly, Drs. Compton and Oliver do offer specialized knowledge that will help the jury. Thus, their testimony regarding decedent's cardiac event is not inadmissible for lack of helpfulness. Dr. Compton's admission that nothing in decedent's medical record supports his opinion does not render his testimony inadmissible. Inconsistencies in Dr. Compton's statements go to the weight of his testimony, not admissibility, and are subject to being tested by "vigorous cross-examination." Daubert, 509 U.S. at 596.

    b. Reliability

Plaintiffs also challenge the reliability of the doctors' principles and methods. Plaintiffs argue that the doctors' opinions are unreliable because they do not consider and rule out other causes of decedent's fall and are not based on sufficient evidence.

Unless an expert "utterly fails to consider alternative causes," an expert opinion need not

8

eliminate all possible causes of injury to be admissible on the issue of causation. See Westberry, 178 F.3d at 264–66. ("[A] medical expert's . . . conclusion should not be excluded because he or she has failed to rule out every possible alternative cause of a plaintiff's illness.") (internal quotations omitted). Unexplained alternative causes affect the weight of the expert's testimony, not the reliability of the methodology used. Id. ("[Existing] alternative causes . . . affect the weight that the jury should give the expert testimony and not the admissibility of that testimony.") (internal quotations omitted).

In light of these principles, the doctors' opinions are not unreliable for failing to consider alternative causes of decedent's fall. In any event, the doctors do rule out other possible reasons for decedent's fall. For example, Drs. Compton and Oliver both discuss why, in their professional opinion, it is unlikely that decedent accidently drove his wheelchair off the curb. (DE 69-13 at 6; DE 69-14 at 8–9).

To support their position, plaintiffs rely on Cooper v. Smith & Nephew, Inc. 259 F.3d 194 (4th Cir. 2001). In Cooper, an orthopedic surgeon testified as to the cause of the plaintiff's injury. The surgeon opined that the plaintiff's injuries were caused by a pedicle screw system's failure to provide spinal stability during spinal surgery. However, the surgeon did not discuss other possible causes of the plaintiff's injury. In affirming the district court's exclusion of the testimony, the Fourth Circuit held that, "if any expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony." Id. at 204.

Unlike the expert in Cooper, Drs. Compton and Oliver do discuss other potential causes of decedent's fall. As previously mentioned, the doctors both explain why it is unlikely that decedent

9

accidently drove his wheelchair off the curb. Additionally, both doctors rule out other possible sequencing scenarios and discuss why, in their professional opinions, decedent's cardiac event preceded decedent's head injury. For example, in his report, Dr. Oliver explains why blood loss did not play a major role in decedent's death or cardiac event. (DE 69-14 at 2–5). Similarly, Dr. Compton explains why, based on decedent's CT scan results, decedent's head trauma could not have preceded his cardiac event. (DE 69-13 at 4–5).

Furthermore, the doctors opinions are based on sufficient evidence. As previously noted, the doctors consider medical evidence in reaching their conclusions regarding decedent's fall and cardiac event. This medical evidence, considered with the known circumstances, formed the basis of their opinions. Since the doctors relied on scientific knowledge and medical expertise to develop their opinions, testimony regarding the timing of decedent's fall is admissible. See Daubert, 509 U.S. at 590. Perceived faults in the doctors' medical analysis does not affect admissibility of their testimony. See Westberry, 178 F.3d at 265–66; McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1044 (4th Cir. 1995) (recognizing that faults in a doctor's diagnosis methodology affect only the weight, and not the admissibility, of his testimony). Accordingly, the doctors' opinions regarding decedent's cardiac event are sufficiently reliable under Rule 702.

For the foregoing reasons, no Rule 702 problem exists here, where the doctors opinions are sufficiently reliable and helpful to the trier of fact. Consequently, plaintiffs' motion to strike is denied.

2. Dr. Owens

Defendant moves to exclude testimony from Dr. Owens regarding decedent's cause of death. If permitted to testify, Dr. Owens will opine that decedent died from hypoxic-ischemic

encephalopathy,[4] which resulted from the head injury he sustained when he fell from his wheelchair on July 21, 2013. Defendant asserts two grounds for exclusion: 1) Dr. Owens's testimony is based on speculative data; and 2) his opinion is not based on reliable principles and methods. The court first addresses whether the speculative nature of data relied upon by Dr. Owens precludes his testimony.

      a. Speculative Data

Defendant first challenges the reliability of Dr. Owens's testimony by arguing that it is based on speculative and unreliable data. To be reliable, an expert opinion must be "based on scientific, technical, or other specialized knowledge and not on belief or speculation." Oglesby v. Gen. Motors Corp., 190 F.3d 244, 250 (4th Cir. 1999) (internal citations omitted). "All inferences must be derived using scientific or other valid methods." Id. However, "[a]n expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record." Tyger Const. Co. Inc. v. Pensacola Const. Co., 29 F.3d 137, 142 (4th Cir 1994).

As a preliminary matter, Dr. Owens is well-qualified to testify as to decedent's cause of death. Dr. Owens is board certified in anatomic, clinical and forensic pathology, and has extensive experience investigating causes of death related to both natural diseases and blunt force trauma injuries.

Under the given circumstances, Dr. Owens is permitted to testify about decedent's cause of death. Based on a review of medical records from NHRMC, EMS records, witness statements, photos of decedent, and decedent's death certificate, Dr. Owens reached the conclusion that the head injury decedent suffered in the fall, and the resulting loss of blood, caused decedent's untimely

---

[4]Hypoxic-ischemic encephalopathy results from inadequate blood flow and low oxygenation to the brain. (DE 70-3 at 4).

passing.

Consistent with standard practice, Dr. Owens considered the circumstances surrounding decedent's fall, as well as decedent's relevant medical history, in developing his opinion regarding decedent's cause of death. After reviewing all evidence presented to him, Dr. Owens presents a chain of events that he believes, considered with decedent's medical conditions, explains decedent's cause of death.

According to Dr. Owens's report, which references decedent's hospital records, sometime around 12:10 p.m. on July 21, 2013, Silver Stream staff found decedent lying face down in the parking of Silver Stream. " (DE 70-3 at 3). When staff first found him, decedent was unresponsive, had a light pulse, shallow respirations, and a deep abrasion on his forehead "that was . . . spurting blood." (Id.). By the time EMS arrived, decedent was in PEA arrest[5] and had agonal respirations. (Id.). At that time, decedent "was bleeding rather profusely." (Id.). Upon his arrival at the hospital, evaluation revealed that decedent had anemia and low hemoglobin. (Id.). Additionally, ECG results showed normal sinus rhythm, incomplete right bundle branch pattern ("RBBB"), and a prolonged QT. (Id. at 4). After he arrived, a neurologist examined decedent and diagnosed him with hypoxic-ischemic encephalopathy with no chance for meaningful neurologic or functional recovery. (Id.). This sequence of events, together with decedent's medical conditions, led Dr. Owens to conclude that decedent died from hypoxic-ischemic encephalopathy. (Id.).

Defendant contends that Dr. Owens's opinion is unreliable because it is based on unsworn witness statements and speculative data. Defendant argues that the court should exclude Dr. Owens's testimony because, by his own admission, eyewitnesses often estimate blood loss volume

---

[5]When an individual is in PEA arrest, his heart has electrical activity, but he has no pulse. (DE 69-15 at 82–84).

inaccurately. (DE 76-3 at 27 ) ("[P]eople can tend to overestimate a volume.").

Contrary to defendant's suggestion, Dr. Owens's opinion is not "based on assumptions which are speculative and . . . not supported by the record." Tyger. 29 F.3d at 142. Although Dr. Owens does rely on unsworn witness statements in forming his opinion regarding decedent's cause of death, he also relies on EMS records indicating that decedent had significant blood loss, photos of decedent, and records from NHRMC. Combined, this evidence led Dr. Owens to conclude that decedent suffered significant blood loss and died from hypoxic-ischemic encephalopathy.

Although the amount of blood decedent lost is somewhat speculative, the assumptions Dr. Owens made regarding this amount are supported by eyewitness statements, EMS reports, photographs of decedent, and records from NHRMC. Emergency department critical care records and decedent's neurology consultation report both indicate that decedent sustained significant blood loss. (DE 76-5) ("[P]atient was . . . typed and crossed for 2 unites of blood products as he bled quite profusely from his large abrasion to his forehead."). Even if the eyewitness statements and EMS reports are unreliable,[6] defendant does not suggest that accounts from hospital nurses and attending physicians are similarly unreliable. Additionally, there is no evidence that forensic pathologists do not normally rely on emergency department records and consultation reports when no measure of blood loss volume is available.

---

[6]Defendant challenges the reliability of the EMS reports. In his report, Dr. Oliver contends that EMTs often estimate blood loss inaccurately. (DE 69-14 at 7). Dr. Oliver cites a 2001 study to support this fact. (Id.) (internal citations omitted). In that study, 8% of first responders were within 20% of actual blood loss and 24% were within 50% of actual blood loss. Id.) (internal citations omitted). However, this study does not render Dr. Owens's opinion inadmissible. Rate of error is just one of several factors courts consider in determining whether an expert opinion is sufficiently reliable under Rule 702. See Nease, 2017 WL 437665, at *6. For the reasons set forth herein, Dr. Owens's testimony is sufficiently reliable.

Furthermore, decedent's blood loss was not the only factor Dr. Owens considered in forming his opinion. Decedent's ECG results and CT scans also factored into Dr. Owens's opinion. For example, in his deposition, Dr. Owens explains that decedent's lack of pulmonary emboli and cardiac ischemia indicate that a sudden cardiac event was not the primary cause of his death. (DE 76-3 at 31). Thus, Dr. Owens's reliance on unsworn witness statements does not preclude his testimony under Rule 702.

      b. Unreliable Methodology

Next, defendant contends that Dr. Owens's opinion is unreliable because he failed to review decedent's medical records and account for his history of anemia. According to Dr. Owens, determining an individual's cause of death, "require[s] knowledge of the extent/severity of the disease(s) as well as the injuries and proposed circumstances that immediately preceded the terminal event." (De 70-3 at 2). In making this determination, a forensic pathologist must also "determine if the described circumstances related to the given history fit with the physical evidence of injury to the bodies and findings from medical, surgical, and radiographic evaluations." (Id.)

Relying on E.E.O.C. v. Freeman, defendant argues that Dr. Owens's opinion as to decedent's cause of death is inadmissible because Dr. Owens failed to review all decedent's medical records. 778 F.3d 463 (4th Cir. 2015). In Freeman, the Fourth Circuit upheld the district court's exclusion of expert testimony where the expert ignored a substantial amount of available and relevant information when developing his opinion. Id. at 468–69 (Agee, J., concurring).

Unlike the expert in Freeman, Dr. Owens did not ignore available data. Rather, Dr. Owens did not consider decedent's entire medical history because he was never provided all decedent's medical records. Still, defendant maintains "[t]hat Dr. Owens did not voluntarily choose to ignore
14

the records does not change the analysis." (DE 70 at 16).

Relying on Martin v. Bimbo Foods Bakeries Distrib., Inc., defendant contends that Dr. Owens should have independently verified the accuracy of the information counsel provided him. No. 5:14-CV-17-BR, 2016 WL 4621075, at *2 (E.D.N.C. Sept. 6, 2016) ("Even though such data purportedly was derived from data produced by defendant, plaintiff's counsel, not the expert, was the one who derived the data. Without having verified that data, the expert's testimony is unreliable and not admissible."). In Martin, an expert testified as to the amount of lost profits the plaintiff allegedly sustained. To calculate the value of those lost profits, the expert relied, in part, on an analysis of gross profits developed by the plaintiff's counsel. In excluding the testimony, the court reasoned that because the expert "could not testify as to the accuracy of the numbers he used to form the basis of his calculations," his opinion was inadmissible. Id. at *2. Since the gross profits provided by plaintiff's counsel differed from the gross profits plaintiff reported on his federal income tax returns, the court held that the expert should have independently verified the financial data counsel provided him.

Here, unlike Martin, there is no indication that information plaintiff's counsel provided Dr. Owens was inaccurate. Furthermore, even though decedent's entire medical history was not captured in the records provided to Dr. Owens, Dr. Owens testified that he did consider many of decedent's medical conditions, including decedent's anemia, in developing his opinion. (DE 76-3 at 25–27). For example, in his deposition, Dr. Owens testified as follows:

Q. . . . He had – evaluation at the hospital that revealed anemia; correct?

A. Yes.

Q. And that anemia that was identified at the emergency room is the cornerstone of your opinion that the anemia is the cause for low blood flow, low oxygenation to the

15

> brain that caused the encephalopathy that led to death; correct?
>
> A. Well, its one of the – yes, I mean obviously he's got low hemoglobin. And we also know that he has low hemoglobin by his history, that he's got anemia in the past.
>
> Q. Where did you learn that?
>
> A. From the medical records.
>
> \*   \*   \*
>
> Q. Okay. And you attributed the hemoglobin or the anemia – excuse me, let me be more precise – the anemia that was found in the Emergency Department to be the result of a loss of blood, not as the result of a longstanding medical condtion?
>
> A. Well, I took into account that some of his hemoglobin low level may have been from his chronic condition. But then we have witnesses that are talking about he's bleeding profusely, he's spurting blood. And again, they're a little lower than what he normally is. He is continued to be hypotensive. . . . He runs chronically low blood levels. It could be enough with that loss of blood to be an insufficient supply to his brain.

(Id. at 16–17). Although decedent's entire medical history "could potentially influence" Dr. Owens's conclusions, (Id. at 57), more information regarding decedent's medical history would not necessarily enable him to give a "more accurate opinion as to [decedent's] cause of death." (Id. at 39). Because Dr. Owens had sufficient information to form his opinion, (Id. at 50), his testimony is not inadmissible because he failed to review all decedent's medical records. See SAS Inst. v. World Programming Ltd., 125 F. Supp. 3d 579, 590 (E.D.N.C. 2015) ("Even if the complete universe of evidence could have impacted Storer's opinion, the court cannot substitute its judgment for that of the expert as to what is sufficient evidence to inform his . . . conclusion.").

Based on the foregoing, Dr. Owens's opinion is sufficiently reliable under Rule 702. Therefore, defendant's motion to strike is denied.

16

## CONCLUSION

For the reasons explained above, plaintiffs' motion to strike (DE 68) is DENIED. Dr. Compton and Dr. Oliver are allowed to testify that decedent suffered a cardiac event prior to falling from his wheelchair on July 21, 2013. Defendant's motion to strike (DE 70) is also DENIED. Dr. Owens is allowed to testify as to decedent's cause of death. The parties promptly shall confer and report to the court mutually agreed upon alternative dates for conduct of trial within 10 days from the date of this order.

SO ORDERED, this the 1st day of March, 2017.

LOUISE W. FLANAGAN
United States District Judge